IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Criminal Action No. 2:17-CR-111-D |
| VS. | § | |
| | § | |
| MARTHA CISNEROS-ZEPEDA, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant Martha Cisneros-Zepeda ("Cisneros") moves to suppress and preclude the government from introducing at trial all evidence seized during an October 10, 2017 traffic stop, including her confession. Following an evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

On October 10, 2017, at approximately 10:15 p.m., Danny Nunez ("Trooper Nunez"), a trooper employed by the Highway Patrol Division of the Texas Department of Public Safety ("DPS"), was on patrol on Interstate Highway 40 ("I-40") in Carson County, Texas. I-40 is a known drug trafficking corridor. Trooper Nunez has worked as a law enforcement officer for 27 years. Before working for the DPS, Trooper Nunez worked in San Angelo, Texas doing interdiction as a Deputy Sheriff Patrol Sergeant in charge of the K-9 unit. As

_____

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

a DPS trooper, Trooper Nunez has completed interdiction training, is an instructor in the area of interdiction, has taught classes nationwide, and has won several awards for his interdiction work. Trooper Nunez has made numerous highway interdiction traffic stops resulting in over 500 seizures of large amounts of narcotics.

On October 10, 2017 Trooper Nunez was working patrol on I-40 in a marked DPS patrol car. With him in the vehicle were Officer Daryl Johnson and Sergeant Robert Hafley ("Sgt. Hafley"). It was dark outside and traffic was light. Trooper Nunez was parked approximately two to three feet off of the road on the south shoulder of I-40, near mile marker 92.

As Trooper Nunez and the two officers were seated in the parked patrol car, one of the officers stated, "[w]e're fixing to get hit." At that moment, Trooper Nunez heard a vehicle—later identified as a white 2014 Chrysler 300 (the "Chrysler") being driven by defendant Cisneros—drive for about two or three seconds on the rumble strip situated behind his parked car, and then change lanes. According to Trooper Nunez, the rumble strip was located approximately six to eight inches outside of the fog line (i.e., the painted line on the shoulder side of the highway), on the improved shoulder of the road. Trooper Nunez activated his radar, which indicated that the Chrysler was traveling at 73 m.p.h. before it dropped rapidly to 53 m.p.h. Once the Chrysler passed Trooper Nunez's patrol car, it changed lanes into the passing lane and continued eastbound on I-40. Trooper Nunez activated his forward facing radar, which indicated that the Chrysler was traveling at 57 m.p.h. after it passed him. Based on the Chrysler's driving on the improved shoulder of the

road over the rumble strips, decelerating from 73 to 53 m.p.h., and maintaining a lower speed of 57 m.p.h., Trooper Nunez believed that the driver might be intoxicated or tired, and he decided to follow the Chrysler.

Trooper Nunez pulled behind the Chrysler and followed it for approximately two minutes. As he did, he observed it travel from the center of the right-hand lane over to the fog line on the right shoulder of the road. According to Trooper Nunez, the outside edge of the Chrysler's right rear tire extends three to five inches beyond the edge of its taillights, so that when he observed the Chrysler's right taillight aligned on top of, or near, the fog line, the vehicle's right rear tire would have been over the fog line.[2] Trooper Nunez then observed the Chrysler drift back to the center line on the road and actually cross over the center line. Based on the Chrysler's weaving within the lane and driving over the fog line and onto the improved shoulder, Trooper Nunez believed the driver might have been intoxicated or tired. He then slowed his vehicle, pulled behind the Chrysler, and activated his emergency lights to effect a traffic stop.

After the Chrysler came to a full stop, Trooper Nunez pulled in behind it and got out to speak to the driver, approaching the Chrysler on the passenger side. Trooper Nunez noticed that the driver of the Chrysler had left her right blinker on, even after she had stopped the vehicle. Trooper Nunez knows from his prior experience that this is an indicator that the

---

[2]During the suppression hearing, Cisneros called as a witness Gary Owens ("Owens"), a private investigator. Owens testified, *inter alia*, that a car's taillights normally align with the edge of the car, but that he could not say, without looking at this particular vehicle, whether its taillights were inset from the edge of the car.

driver may be engaged in criminal activity, i.e., an indicator of nervousness.

After making contact with Cisneros, Trooper Nunez stated to her that she was "all over the road" and asked her, "[a]re you alright?" Cisneros replied, "[y]eah, I'm fine." Trooper Nunez then asked Cisneros for her driver license and told her that he would issue her a warning. She stated, "[a]ll right. I apologize for that." Trooper Nunez observed that Cisneros's hand and arm were shaking when she handed her driver license to him. Trooper Nunez then asked Cisneros to come back to his patrol car so he could issue the warning.

During the time Trooper Nunez was standing near the Chrysler, he made several observations that led him to suspect that Cisneros might be involved in criminal activity. First, he observed a blanket, pillow, and energy drink inside the vehicle. These items were suspicious to Trooper Nunez because, based on his training and experience, he knows that when individuals are transporting narcotics, they never want to leave their car, and they often sleep inside it, because they are responsible for the contraband they are transporting. Second, Trooper Nunez found it odd that Cisneros, a female, appeared to be traveling alone over a long distance. Third, Trooper Nunez observed that the Chrysler was registered out of Albuquerque, New Mexico, which he knows to be a source state for narcotics. Fourth, as Trooper Nunez walked by the Chrysler, he observed a chunk of foam situated in the back seat. This was suspicious because Trooper Nunez knows that narcotics are sometimes transported in vehicles that have been modified to include hidden compartments, or in which someone has used natural voids in the vehicle to conceal illegal narcotics, and remnants of the process, such as pieces of foam, are left behind.

Trooper Nunez returned to his patrol car with Cisneros and asked her to sit in the front passenger seat. He testified that he observed that she was breathing heavily, "like she had just finished running a race," and was using her hands when she talked. Trooper Nunez immediately began running computer checks on Cisneros and the Chrysler. While completing the process of issuing a warning, Trooper Nunez asked Cisneros routine questions about her trip. In response to a question about where she was headed so late at night, Cisneros replied, "I'm going over to Clarksville with my grandpa." Trooper Nunez then stated, "Clarksville?" to which Cisneros replied, "[u]h, Kansas. He's a little sick over there." When Trooper Nunez asked again what state Clarksville was in, Cisneros responded, "Clarksville, Kansas?" This was suspicious to Trooper Nunez because he has intercepted a lot of illegal narcotics being transported to Clarksville, *Arkansas*, and he had never heard of a Clarksville, *Kansas*. Trooper Nunez asked Cisneros whether her grandfather was ill, to which she replied, "[y]eah. My grandpa's sick over there." When Trooper Nunez asked what was wrong with her grandfather, Cisneros stated, "[h]e has a—, problems with the heart so he had a little like stroke." Trooper Nunez later asked Cisneros whether her grandfather was in the hospital, and Cisneros explained that "he already got out. He just had a stroke." Trooper Nunez found this suspicious because if Cisneros' grandfather had previously been in the hospital but had already been released, there would have been no reason for her to be traveling so late at night to go see him since there was no longer any emergency.

Trooper Nunez noticed that Cisneros appeared to be wearing a wedding ring, and he asked her if she was married. Cisneros responded, "[n]o," and explained "I'm not married

yet." Trooper Nunez asked her where her fiancé was, and Cisneros stated, "he's at work." When asked what type of work her fiancé does, Cisneros stated, "[c]onstruction." She further clarified that her fiancé was "working in Chama." Trooper Nunez asked why Cisneros' fiancé didn't want to come with her. Cisneros replied, "[n]o, he's working." Trooper Nunez asked if there was a lot of construction work "down there." Cisneros stated, "[n]ot that much. They've been having to go out of town and stuff like that. Like he just came back from Chama." When Trooper Nunez asked whether Chama was in Texas, Cisneros stated that she did not know where Chama is located. Trooper Nunez found Cisneros' story inconsistent because at one point Cisneros said that her fiancé was working in Chama, and later she said that he was back from Chama. Trooper Nunez testified that he found it odd that, when asked, Cisneros could not provide any details about Chama, explaining that if his wife or girlfriend was going out of town to work, he could say exactly where it was, if it was in New Mexico or Texas.

Trooper Nunez noticed that Cisneros was bouncing a coin off the seat. He testified that these types of fidgety movements are suspicious because a person transporting narcotics will often try to occupy her time with something else to divert her mind from the questions. Trooper Nunez also testified that the way Cisneros was dressed was suspicious. Even though it was cold outside, Cisneros was wearing a muscle shirt, and Trooper Nunez believed, based on past experience, that females transporting narcotics dress provocatively or in a "flirtatious manner" in order to try to distract the officer.

Trooper Nunez printed the warning for a violation of Tex. Transp. Code Ann. §

545.058, driving on an improved shoulder. He handed the warning, Cisneros' driver license, and all her vehicle documents to her. Trooper Nunez testified that, at this point in the traffic stop, based on all that he had observed, he believed that Cisneros was involved in criminal activity. Trooper Nunez asked Cisneros, "Martha, can I ask you a couple more questions?" Cisneros responded, "[y]es, sir." Trooper Nunez then asked Cisneros a series of questions regarding whether she was involved in any illegal activity, including whether she had any narcotics in the Chrysler.

After Cisneros denied being involved in illegal activity, Trooper Nunez asked, "[c]an I search your car?" Cisneros replied, "[y]eah, I mean, that's fine. There's nothing in it." Trooper Nunez stated, "[a]ll right. Let me just get closer. You can stay in here since it's warmer." Cisneros stated, "[o]kay, sir. I mean, is there a reason, though?" Trooper Nunez replied, "I'm asking you if I can search it." Cisneros then asked, "[b]ut is there a reason?" Trooper Nunez stated, "[y]ou can say yes or no, hon." Cisneros asked again, "I mean, but is there a reason?" Trooper Nunez answered, "[y]eah. I believe there's something illegal inside that car." Cisneros laughed, stating, "[i]s that right?" She then stated, "[g]o ahead, sir." Trooper Nunez said, "[a]ll right," and Cisneros replied, "[y]eah, go ahead."

Trooper Nunez and Sgt. Hafley then exited the patrol car and began to search the Chrysler. During the search, Trooper Nunez located a neck pillow on the passenger side floorboard. When he lifted the neck pillow, he noticed that it was heavier than a normal pillow. He could see that the pillow's seam had been loosely re-sewn, and there was white stuffing poking out of the seam. Trooper Nunez could also feel one or more hard objects in

the pillow. He ripped the seam to the neck pillow and located two foil-wrapped bundles of suspected narcotics concealed inside. Cisneros was placed under arrest and handcuffed.

Trooper Nunez returned to his patrol car and sat in the driver seat. He informed Cisneros that he was going to read her rights to her. In response, she asked, "[w]hat's going to happen to my car and stuff?" Trooper Nunez told her that they would "take care of that here in a minute." He then read Cisneros her *Miranda* warnings. Trooper Nunez next explained to Cisneros that they were going to transport the Chrysler to "the office" and then "take it from there." Cisneros asked if the car would be repossessed. Trooper Nunez responded, "[n]o, I'm not—, I don't want to do that to you . . . I'm not going to leave you walking with a kid." Cisneros replied, "I know I f---ed up. It's my first time. I f---ed up doing whatever."[3]

The suspected narcotics were weighed. The gross weight was 3.28 gross pounds. A sample was field-tested, and it yielded a positive result for methamphetamine.

Cisneros moves to suppress and preclude the government from introducing as evidence at trial the contraband seized during the traffic stop, including her confession. The government opposes the motion. The court has conducted an evidentiary hearing.

## II

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure'

---

[3]This statement is the confession, discussed *infra* at § VII, that Cisneros moves to suppress.

under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004).

Evidence derived from an unreasonable search or seizure generally must be suppressed under

the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zarza*, 782 F.3d 246,

249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)).

"Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only

to a few specifically established and well-delineated exceptions.'" *Id.* (quoting *United States*

*v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception comes from *Terry v. Ohio*,

392 U.S. 1 (1968).

The framework articulated in *Terry* is used to analyze the legality of a traffic stop.

"Under the two-part *Terry* reasonable suspicion inquiry, [the court asks] whether the officer's

action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the

circumstances which justified the interference in the first place.'" *United States v.*

*Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20). "A

temporary, warrantless detention of an individual constitutes a seizure for Fourth

Amendment purposes and must be justified by reasonable suspicion that criminal activity has

taken or is currently taking place; otherwise, evidence obtained through such a detention may

be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Reasonable

suspicion requires more than merely an unparticularized hunch, but considerably less than

proof of wrongdoing by a preponderance of the evidence." *Id.* (internal quotation marks and

citation omitted). As this court has previously explained:

> For a traffic stop to be justified at its inception, an officer must
> have an objectively reasonable suspicion that some sort of
> illegal activity, such as a traffic violation, occurred, or is about
> to occur, before stopping the vehicle. The Supreme Court has
> stated that in making a reasonable suspicion inquiry, a court
> must look at the totality of the circumstances of each case to see
> whether the detaining officer has a particularized and objective
> basis for suspecting legal wrongdoing. We have stated
> previously that reasonable suspicion exists when the officer can
> point to specific and articulable facts which, taken together with
> rational inferences from those facts, reasonably warrant the
> search and seizure. In evaluating the totality of the
> circumstances, a court may not consider the relevant factors in
> isolation from each other. In scrutinizing the officer's basis for
> suspecting wrongdoing, it is clear that the officer's mere hunch
> will not suffice. It is also clear, however, that reasonable
> suspicion need not rise to the level of probable cause.

*United States v. Johnson*, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.)

(quoting *Lopez-Moreno*, 420 F.3d at 430).

Although "[a] defendant normally bears the burden of proving by a preponderance of

the evidence that the challenged search or seizure was unconstitutional[,] . . . where a police

officer acts without a warrant, the government bears the burden of proving that the search

was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citations omitted).

Accordingly, "[t]he government bears the burden of establishing by a preponderance of the

evidence [the] two elements under *Terry*[.]" *Johnson*, 2006 WL 1041148, at *3 (citing

*United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003); *United States v. Riley*, 968

F.2d 422, 424-25 (5th Cir. 1992)).

## III

The court considers first whether the government has met its burden of proof as to the first *Terry* element.

## A

The government maintains that Trooper Nunez had reasonable suspicion to stop Cisneros because she drove on the improved shoulder of the highway without justification, in violation of Tex. Transp. Code Ann. § 545.058(a) (West 2011), which states:

> An operator may drive on an improved shoulder to the right of the main traveled portion of a roadway if that operation is necessary and may be done safely, but only:
>> (1) to stop, stand, or park;
>> (2) to accelerate before entering the main traveled lane of traffic;
>> (3) to decelerate before making a right turn;
>> (4) to pass another vehicle that is slowing or stopped on the main traveled portion of the highway, disabled, or preparing to make a left turn;
>> (5) to allow another vehicle traveling faster to pass;
>> (6) as permitted or required by an official traffic-control device; or
>> (7) to avoid a collision.

The government contends that Trooper Nunez saw the Chrysler drive onto the improved shoulder behind him; he could hear the Chrysler drive on the shoulder because the vehicle's tires drove over the rumble strip; Cisneros has not claimed that she drove on the shoulder for any of the seven reasons permitted under Tex. Transp. Code Ann. § 545.058(a); in addition, Cisneros drove onto the shoulder in an unsafe manner, which could have resulted

in a collision; Cisneros drove on the shoulder again as Trooper Nunez followed her vehicle; Trooper Nunez had reasonable suspicion, if not probable cause, to believe Cisneros had violated Tex. Transp. Code Ann § 545.058(a); and, accordingly, the stop was justified at its inception. The government also contends that Trooper Nunez had reasonable suspicion to believe that Cisneros was intoxicated or fatigued, which also justified the traffic stop.

Cisneros counters that Trooper Nunez did not have reasonable suspicion to stop her for violating § 545.058(a) because the dashcam video shows that, for more than two minutes before she was pulled over, her vehicle did not cross the fog line or drive on the improved shoulder of I-40 between mile markers 92 and 93; even if Trooper Nunez heard her vehicle drive on the rumble strips near the fog line on the shoulder of I-40, under Texas law, that does not constitute a traffic violation; in any event, driving on the improved shoulder or the rumble strips near the shoulder, without more, is insufficient to constitute a violation of § 545.058; and it was therefore objectively unreasonable for Trooper Nunez to stop her vehicle

B

This court has recognized that "[d]riving on an improved shoulder is an offense under Tex. Transp. Code Ann. § 545.058." *United States v. McMahan*, 2007 WL 2470999, at *4 (N.D. Tex. Aug. 30, 2007) (Fitzwater, J.). Trooper Nunez testified credibly that he stopped Cisneros based on his observation that she had driven on an improved shoulder. Before the Chrysler passed his stopped vehicle, Trooper Nunez heard it drive on the rumble strip behind

him, indicating that it was being driven on the improved shoulder.[4] Moreover, although the video evidence presented during the suppression hearing is inconclusive—it shows only that the Chrysler's taillights stayed inside of the fog line—Trooper Nunez credibly testified that, as he was following Cisneros, he believed her vehicle's taillights were inset three to five inches from the outside edge of the right rear tire, such that when the taillights aligned with the fog line at the edge of the road, the Chrysler's right rear tire was actually over the fog line and on the improved shoulder. Although Cisneros presented evidence that the Chrysler's tires did not extend beyond the *edge of the vehicle*, she did not present any credible evidence that the vehicle's tires did not extend beyond the edge of the taillights. Because the court finds Trooper Nunez's testimony to be credible, and because there is no contrary evidence, including evidence disputing Trooper Nunez's belief regarding the configuration of the Chrysler, the court concludes, based on Trooper Nunez's personal observation of this offense, that Trooper Nunez had reasonable suspicion, if not probable cause, to effect a

---

[4]Owens testified at the suppression hearing that Cisneros told him it was her intention when driving on the rumble strip behind Trooper Nunez's car to stop her vehicle so that she could eat a snack and drink coffee that she had just purchased. Cisneros informed Owens that she changed her mind and decided to keep driving when she noticed the stopped car on the improved shoulder. The court declines to credit as probative evidence unsworn statements that Cisneros made to Owens when she was not under oath and subject to cross-examination. But even if it did accept such testimony, evidence that Cisneros was intending to stop her vehicle at the time she drove over the rumble strip would not undermine the evidence that Trooper Nunez reasonably believed he witnessed Cisneros driving on the improved shoulder—and *not* for one of the permissible reasons in Tex. Transp. Code § 545.058—when he was following Cisneros' vehicle.

traffic stop.[5]  The stop was therefore justified at its inception.

Moreover, even if the court finds from its viewing of the video evidence that Trooper Nunez was mistaken in concluding that the Chrysler was driven on the improved shoulder, "when an officer is factually mistaken as to the existence of a traffic offense, that mistake does not render the stop illegal."  *United States v. Grazioso*, 2006 WL 1767677, at *5 n.7 (N.D. Tex. June 28, 2006) (Fitzwater, J.), *opinion vacated in part on reconsideration*, 2006 WL 2285585 (N.D. Tex. Aug. 9, 2006) (Fitzwater, J.), *aff'd*, No. 07-10075 (5th Cir. Mar. 31, 2008); *see also United States v. Avagyan*, 164 F.Supp.3d 864, 884-85 (E.D. Va. 2016) ("an officer's mistaken beliefs are typically irrelevant during a motion to suppress, so long as the mistaken belief is reasonable." (citing cases)), *aff'd sub nom. United States v. Ghazaryan*, 685 Fed. Appx. 222 (4th Cir. 2017).  Rather, "the only question is whether his mistake of fact was reasonable."  *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003). "An officer's mistake of fact may provide the objective basis for reasonable suspicion or probable cause under the Fourth Amendment because of the intensely fact-sensitive nature

_____

[5]During the suppression hearing, Cisneros relied on this court's opinion in *United States v. Grazioso*, 2006 WL 1767677 (N.D. Tex. June 28, 2006) (Fitzwater, J.), *opinion vacated in part on reconsideration*, 2006 WL 2285585 (N.D. Tex. Aug. 9, 2006) (Fitzwater, J.), *aff'd*, No. 07-10075 (5th Cir. Mar. 31, 2008), in which the court held that "[e]vidence of crossing the solid white line, even multiple times, is alone insufficient to constitute a violation of [Tex. Transp. Code Ann. ] § 545.060."  *Grazioso*, 2006 WL 1767677, at *4. *Grazioso* is distinguishable, however, because the traffic stop in *Grazioso* was based on a suspected violation of Tex. Transp. Code Ann. § 545.060, which prohibits a driver from moving from a single lane unless the movement can be made safely; here, Cisneros was suspected of violating Tex. Transp. Code Ann. § 545.058, which prohibits driving on the improved shoulder unless the driver is doing so for one of seven enumerated purposes, none of which was present here.

of reasonable suspicion and probable cause determinations." *Id.* "[S]o long as the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense, the officer has probable cause to stop the driver." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). Accordingly, even if Trooper Nunez is factually mistaken on the question whether the Chrysler's tires crossed over onto the improved shoulder, the evidence establishes that his belief that Cisneros violated Tex. Transp. Code Ann. § 545.058 was reasonable. It was dark outside, Cisneros had driven on the rumble strip before she passed Trooper Nunez's vehicle, and Trooper Nunez credibly testified that he believed that the Chrysler's taillights were inset from the edge of its wheels by approximately three to five inches. Based on these facts, a reasonable officer could have concluded that Cisneros violated Tex. Transp. Code Ann. § 545.058.

Alternatively, based on Cisneros' maintaining a speed of 57 m.p.h. after passing Trooper Nunez and weaving within her lane of traffic, Trooper Nunez credibly testified that he believed Cisneros was intoxicated or fatigued. Trooper Nunez's reasonable suspicion that Cisneros was driving while fatigued or intoxicated justified the stop at its inception. *See, e.g., United States v. Miller*, 188 Fed. Appx. 287, 288 (5th Cir. 2006) (per curiam) (affirming finding that traffic stop was justified at inception where defendant's "weaving and slow driving at 4:30 in the morning established reasonable suspicion that he could be intoxicated or fatigued").

## IV

The court addresses next whether the government has established by a preponderance of the evidence that Trooper Nunez's actions after stopping the Chrysler were reasonably related to the circumstances that justified the stop.

## A

Under the second prong of *Terry*, the court asks whether Trooper Nunez's actions after stopping Cisneros' vehicle "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Brigham*, 382 F.3d at 507. "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010); *see also United States v. Spears*, 636 Fed. Appx. 893, 901 (5th Cir. 2016) ("The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip." (citing *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609, 1615 (2015); *Pack*, 612 F.3d at 350)). If, however, "the officer develops reasonable suspicion of additional criminal activity[,] . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this

reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (some

alterations in original) (quoting *Pack*, 612 F.3d at 350). As explained above, "[r]easonable

suspicion exists when the detaining officer can point to specific and articulable facts that,

when taken together with rational inferences from those facts, reasonably warrant the search

and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The

determination . . . must be made based on the totality of the circumstances and the collective

knowledge and experience of the officers." *Id*. at 631-32 (citation omitted).

Cisneros contends that the traffic stop ended when Trooper Nunez gave her a warning

citation, and that Trooper Nunez's continued detention of her after the traffic stop had ended

was unsupported by reasonable suspicion and therefore unlawful. The government responds

that Trooper Nunez made several observations that gave him reasonable suspicion that

Cisneros was involved in criminal activity

B

If, during a lawful traffic stop, an officer develops reasonable suspicion of additional

criminal activity, he may further detain the occupants of the vehicle for a reasonable time

while attempting to dispel this reasonable suspicion. *Andres*, 703 F.3d at 833. The

government proved by a preponderance of the evidence that Trooper Nunez developed

reasonable suspicion of additional criminal activity during the initial stop. It also proved

that, after issuing the warning to Cisneros, Trooper Nunez detained her for a reasonable

amount of time—no more than a few seconds—until he requested and received from

Cisneros her consent for him to search the Chrysler.

Trooper Nunez's hearing testimony, which the court finds is credible, established the following. Trooper Nunez has extensive experience in narcotics interdiction, including more than 500 stops that have resulted in seizures of narcotics. I-40 is a well-known drug trafficking corridor, and Trooper Nunez has made numerous stops resulting in the seizure of narcotics on this highway. During the stop of Cisneros' vehicle, she exhibited several signs of nervousness, including that her arm and hands were shaking, she left her right blinker on after exiting the highway, and she bounced a coin off the seat while sitting in Trooper Nunez's patrol car. Trooper Nunez observed a piece of foam on the back seat of Cisneros' vehicle, which in his experience indicated that a piece of the seat has been removed so that drugs could be hidden. Cisneros told Trooper Nunez that she was traveling to Clarksville, Kansas, which Trooper Nunez had not heard of, but Trooper Nunez knew that Clarksville, Arkansas was a common destination for narcotics. Cisneros was traveling from Albuquerque, New Mexico (a known drug source); she was traveling alone, late at night; and, although she stated that she was traveling to visit her sick grandfather, there appeared to be no emergency justifying the late-night travel since Cisneros told Trooper Nunez that her grandfather had recently been released from the hospital. And Cisneros gave inconsistent answers to Trooper Nunez's questions about her fiancé's work, telling Trooper Nunez that he was "working in Chama" and also that he just returned from Chama.

The facts in this case are similar to those in *Pack*, 612 F.3d at 361-62, in which the Fifth Circuit held that reasonable suspicion sufficient to support a 35-minute investigatory stop was created by the defendant's extreme nervousness, conflicting stories, and the fact that

he was traveling along a trug trafficking corridor.  *Id.*  In reaching its conclusion, the court gave "significant weight" to the detaining officer's suspicion, noting that "he had been a law enforcement officer for seventeen years."  *Id.* at 361.  As to the allegedly suspicious facts the detaining officer observed, the court held:

> [w]hen the occupants of a vehicle are nervous and tell such irreconcilable stories to the police, the number of likely explanations for their conduct is limited. . . . Considering the large volume of contraband that is moved along our major highways on a daily basis, especially in border states like Texas, a reasonable officer could fairly conclude that the most likely single alternative explanation, for the nervousness and irreconcilable stories raising reasonable suspicion of some criminal activity, is that the occupants are carrying contraband, particularly when the stop occurs on a highway that is frequently used by smugglers. Therefore, we think that it is reasonable for an officer confronted with such conduct to detain the occupants for a reasonable amount of time to investigate the possibility that they are carrying contraband. Worley testified that Pack's extreme nervousness, the irreconcilable stories, and the location of the stop immediately caused him to suspect drug activity. Accordingly, he investigated the possibility that Pack and Williamson were smuggling drugs by requesting permission to search their vehicle and calling in a canine unit when permission was denied. We hold that Worley's decision to investigate the possibility of drug trafficking was reasonable, because drug trafficking provided a reasonably likely explanation for the suspicious facts that he had observed.

*Id.* at 362.

Here, as in *Pack*, Cisneros was traveling along a drug trafficking corridor, the circumstances of her trip did not appear to justify her late-night travel, she gave Trooper Nunez inconsistent accounts of her fiancé's work, and she exhibited several indicators of nervousness.  In addition, Trooper Nunez observed a piece of foam on the back seat of the

- 19 -

Chrysler; based on his experience and training, this often indicates that contraband has been hidden inside a vehicle. These facts, which Trooper Nunez observed while effecting a lawful traffic stop of reasonable duration, created reasonable suspicion that additional criminal activity was afoot. Trooper Nunez was therefore entitled to detain Cisneros for a reasonable time while attempting to dispel this reasonable suspicion. And within moments of initiating that process—i.e., after issuing the warning to Cisneros—he secured Cisneros' consent to search the Chrysler. "A search conducted pursuant to consent is excepted from the Fourth Amendment's . . . requirements." *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002). Accordingly, the court holds that Cisneros' Fourth Amendment rights were not violated.

V

Cisneros next contends that any consent she gave to search her vehicle was involuntary.

A

Where the government asserts that no search warrant was required because the officer obtained voluntary consent for the search, the government must prove by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997). Whether "consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

> In evaluating the voluntariness of consent, [the Fifth Circuit] look[s] to six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir. 2008). No single factor is dispositive or controlling. *Solis*, 299 F.3d at 436.

The court finds and concludes that the first factor weighs in favor of the government because Cisneros was not in custody when Trooper Nunez requested consent to search the Chrysler. Trooper Nunez had issued a warning to Cisneros and had returned all of her documents (driver license and proof of insurance) to her, and Cisneros was free at that time to go. Trooper Nunez's failure to inform Cisneros that the traffic stop was over and she was free to leave does not establish that Cisneros was in custody when Trooper Nunez requested consent. *See, e.g., Ohio v. Robinette*, 519 U.S. 33, 35 (1996) ("We are here presented with the question whether the Fourth Amendment requires that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary. We hold that it does not.").

As for the second factor, there is no evidence that Trooper Nunez used coercive tactics or that he took unlawful advantage of the situation to obtain Cisneros' consent. The stop began as a routine traffic stop. Trooper Nunez and Cisneros communicated throughout in polite terms. Cisneros was not handcuffed, no threats were used, there was no violence, and

there was no overt display of authority.  Trooper Nunez at no time before arresting Cisneros acted in an intimidating manner or even raised his voice.  The absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance that weighs in favor of upholding what appears to be a voluntary consent.  *See United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973).

Regarding the third factor, Cisneros was cooperative as she answered Trooper Nunez's questions, and she caused no problems.  She verbally consented when Trooper Nunez asked for her consent to search the Chrysler.  And she never revoked her consent.

For the fourth factor, there is no indication that Cisneros was aware of her right not to consent.  But Trooper Nunez did ask Cisneros for her consent in a manner that suggested that such consent was needed.  In fact, he specifically told her, "You can say yes *or no*."  Moreover, there is no absolute requirement that the government establish that Cisneros knew she could refuse; it is merely one of the factors.  *See Schneckloth*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."); *see also United States v. Davis*, 749 F.2d 292, 296 (5th Cir. 1985) ("Proof of knowledge of the right to refuse consent is not required to show voluntariness.").

Concerning the fifth factor, there is no evidence that Cisneros had a limited education or was of below average intelligence.

Finally, with respect to the sixth factor, given that the drugs were hidden inside a neck pillow, it is likely that Cisneros believed that Trooper Nunez would not find any

incriminating evidence.  *See United States v. Cooper*, 43 F.3d 140, 148 (5th Cir. 1995) (holding that sixth factor weighed in favor of voluntariness of consent to search where defendant "probably did not think [officer] would be able to locate the drugs by the pat-down, much less identify the package as containing crack cocaine.").

Taking all six of the factors into consideration, the court finds and concludes that Cisneros' consent was voluntary and valid.

VI

Cisneros argues that, even assuming that consent to search the Chrysler was voluntarily given, Trooper Nunez's search of the neck pillow's content and its destruction exceeded the scope of the purported consent.  The government responds that Trooper Nunez did not exceed the scope of Cisneros' consent when he opened the neck pillow, and, in any event, he developed probable cause to open the neck pillow.

The court rejects Cisneros' argument that Trooper Nunez's search of the neck pillow's content and its destruction exceeded the scope of the purported consent, and that, therefore, any evidence found within the pillow after its destruction must be suppressed.  The court has already concluded that Cisneros voluntarily consented to a search of her vehicle.  When, pursuant to that valid search, Trooper Nunez lifted the neck pillow, observed that it was heavier than a normal pillow, observed that the pillow seam had been loosely re-sewn and that white stuffing was poking out of the pillow seam, and felt one or more hard objects in the pillow, Trooper Nunez had probable cause to believe that contraband was hidden inside of the neck pillow.  "When probable cause for a search exists, consent is not required."

*United States v. Carmenate*, 344 Fed. Appx. 941, 943 (5th Cir. 2009) (per curiam) (citation omitted).

## VII

Finally, Cisneros contends that her purported confession after she was read her *Miranda* rights was involuntary.

"When a defendant challenges the voluntariness of a confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at the defendant's criminal trial." *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998) (citing *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992)). The government may satisfy its burden of proving voluntariness if it demonstrates that, "under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir. 1996). The focus of the court's voluntariness inquiry must be on the officers' actions; indeed, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Moreover, that coercive conduct must cause the confession. *Id.* at 164.

Cisneros contends that she did not voluntarily, knowingly, and intelligently waive her *Miranda* rights, but, instead, her "will was overborne" when Trooper Nunez repeatedly stated that she needed to think about her child and advised her that if she cooperated and spoke with officers he would help her. The evidence shows, however, that immediately after Trooper

Nunez read Cisneros her *Miranda* rights, Cisneros voluntarily confessed, "I know I f---ed up. It's my first time. I f---ed up doing whatever." Cisneros voluntarily made this statement *before* Trooper Nunez asked Cisneros about her child or indicated that he could help her. Accordingly, any statements Trooper Nunez later made about her children could not have rendered Cisneros' voluntary confession involuntary.[6]

*    *    *

Accordingly, for the reasons explained, Cisneros' motion to suppress is denied.

**SO ORDERED**.

May 10, 2018.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[6]It was not until after Cisneros' voluntary confession that Trooper Nunez referred to Cisneros' child and indicated that there were ways that he could help her. Cisneros did *not* provide Trooper Nunez with any further information, however, after he brought up her child or indicated that he could help her. And she does not argue that the statements she made while being transported to the DPS office or at the DPS office were coerced.